# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| Peter A. Primeau, | Case No. 1:14CV2231 |
| Petitioner, | |
| v. | **ORDER** |
| Benny Kelly, Warden, | |
| Respondent | |

This is a state prisoner's habeas corpus proceeding under 28 U.S.C. § 2254. Following the filing of Magistrate Judge Jonathan Greenberg's Report & Recommendation (Doc. 28), the petitioner's objections (Doc. 29), and the respondent's response thereto (Doc. 30), this matter is before the undersigned for *de novo* review.

For the reasons that follow, I agree with and adopt as the order of this court the Magistrate Judge's Report & Recommendation.

## Background

Rather than summarizing the underlying facts, I, like the Magistrate Judge, set forth the narrative from the opinion of the Ohio Eighth District Court of Appeals:

> {¶ 11} On March 11, 2011, Primeau arrived at the Fairview Hospital emergency room with his wife, Shinobu Higa ("Higa"), at approximately 9:30 p.m. Higa was admitted in critical condition, suffering from obvious signs of physical trauma. She was diagnosed with a perforation to her digestive tract, stomach, small intestine or colon, and was immediately intubated.
>
> {¶ 12} Primeau told doctors that Higa, a Japanese national, had gone out the night before to see a man about her immigration status, and that she returned by bus to their apartment the following morning. Upon her return, Higa told him that she had been beaten and sexually assaulted. Primeau informed the doctors that he had been with her all day and that, although she did not want to go to hospital, he decided to bring her to the emergency room when her condition worsened.

{¶ 13} Police were called to the hospital in response to Higa's condition. Upon arrival, officers interviewed Primeau. He told them that Higa had left the night before and returned in the morning by bus, after having prostituted herself on Lorain Avenue and West 25th Street. Primeau told officers that Higa claimed to have been beaten by a black man. When Higa's condition worsened, Primeau brought her to the emergency room.

{¶ 14} Doctors performed surgery at approximately midnight on the night Higa was admitted to the hospital, in order to repair the perforation. After viewing her internal injuries, the surgeon determined that, based on the inflammation, the amount of fluid, and the color of the fluid, the perforation occurred within the last six hours.

{¶ 15} Nurse Marie Balcerski ("Balcerski") testified at trial that she had been treating Higa prior to the arrival of the police. Balcerski testified that she asked Higa, in the presence of nurse Hannah Horton ("Horton"), if she knew who had done this to her. In response, Higa nodded her head "yes." Balcerski then asked who had done this. Higa pointed to her ring-finger on her left hand, and then to the empty chair where Primeau had been sitting just moments before.

{¶ 16} Higa became agitated after indicating to Balcerski and Horton that Primeau had been her assailant. She began using her finger to spell words. Balcerski watched her spell the words "black man." When asked if that was who beat her, Higa nodded her head "yes." Higa later wrote on a piece of paper "my husband didn't do that."

{¶ 17} Det. Beverly Fraticelli ("Fraticelli") testified that Higa shook her head "no" when asked if her husband had done this to her. When offered pen and paper, Fraticelli testified that Higa wrote "black guy" in response to the question "who has done this to you?" When asked why she had been beaten, Higa wrote "he wanna ass sex but I say no." Due to Higa's inconsistent responses to questions regarding the identity of her assailant, Primeau was arrested.

{¶ 18} Nurse Elizabeth Pettit and nurse Alison Rerko examined Higa for sexual abuse and discovered substantial injuries. The rape kit was tested for DNA. Semen samples were taken from the anal sample and Higa's underwear. The semen and DNA samples were consistent with Higa and Primeau exclusively.

{¶ 19} On March 16, 2011, Higa died as a result of her injuries. An autopsy was performed and determined the cause of death to be homicide, due to the blunt impact to the abdomen that caused a perforation to her duodenum, part of the small intestine. The coroner's report also found that blunt trauma to her head, arms, and legs contributed to the cause of death.

{¶ 20} Detectives began investigating the conflicting accounts of Higa's assault. In the course of their investigation, they found no evidence to support

Primeau's version of events. An investigation by RTA police did not reveal any evidence of Higa's presence on an RTA bus the morning of March 11 in the area of West 25th Street and Lorain, or en route to her apartment. RTA police Det. Pamela McGinty testified that there were no reports of a severely beaten woman on any bus in that vicinity. Video surveillance from a gas station near the bus stop closest to Higa's apartment did not show anyone matching her description exiting a bus on the morning of March 11.

{¶ 21} During a voluntary interview with police, Primeau stated that Higa's clothing from the night of March 10 and morning hours of March 11 was located in a blue hamper in their apartment. Police executed a search warrant for the apartment. Police discovered what they believed to be signs of a struggle. There was damage to the door and living room wall, stains on the bedspread, clumps of hair on the bedroom floor, blood on the mattress cover, a first aid kit in the kitchen, latex gloves and cotton balls in the bedroom, and blood on the bathroom floor. Police, however, did not find a blue hamper or the clothing Higa was wearing when she sustained her injuries. The clothing was later discovered in the garbage dumpster outside the apartment building.

{¶ 22} A second search warrant was executed to obtain swabs from the evidence discovered during the first search of the apartment and to measure the holes in the door and wall. During the second search, police found a food receipt on the kitchen table, time-stamped March 11, 2011, 4:57 p.m., from the Giant Eagle grocery store in Rocky River.

{¶ 23} A third search warrant was executed for the vehicle Primeau drove to the hospital on March 11, 2011. Inside the car, police discovered a receipt for a withdrawal made at the Charter One Bank branch located near the Giant Eagle in Rocky River. The withdrawal was time-stamped March 11, 2011, 5:02 p.m. In addition, police found the parking lot receipt from the Fairview Hospital parking garage, time-stamped March 11, 2011, 9:37 p.m.

{¶ 24} Adam Rodeghiero ("Rodeghiero"), a good friend of Primeau's, testified at trial that he and Primeau spoke on the phone on March 11, 2011, just after 6:00 p.m. The phone call lasted approximately 40 minutes, during which time Primeau told him that Higa was nauseous and acting ill. Primeau asked Rodeghiero if he thought that Higa could be "faking being sick for attention or empathy or something along those lines. Or if she was really ill." Rodeghiero suggested that Primeau take Higa to the hospital. Rodeghiero testified that had Higa been assaulted, he would expect Primeau to have told him. Primeau never mentioned the assault to Rodeghiero.

{¶ 25} In addition, several neighbors in the apartment building testified at trial that they had heard arguing, loud noises, and screaming on numerous occasions coming from the apartment Higa and Primeau shared, including the night of March 10, 2011, and the day of March 11, 2011.

{¶ 26} Teressa Fiala ("Fiala") testified that she lives directly above the apartment shared by Higa and Primeau. Fiala began hearing a loud and angry male voice in the apartment below hers in the fall of 2010. In December 2010, she heard what she believed to be the sound of someone being struck, followed by the sound of a woman crying. Fiala called management and complained. In February 2011, Fiala again heard the sound of someone being struck, followed by a woman crying. Fiala testified that on March 11, 2011, she was working at home with headphones on when she heard loud pounding noises coming from the apartment below hers. She was so afraid that she locked her own sliding glass door, fearing that someone would enter her apartment.

{¶ 27} Nicholas Lovano ("Lovano") testified at trial about his encounters with Higa and Primeau at their apartment building. In his job as a pizza delivery driver, he brought pizza to Primeau and Higa approximately three times per month. He recalled observing bruises on Higa and marks on her body and face on multiple occasions.

{¶ 28} Detectives interviewed Primeau's ex-wife, Tiffany Redding ("Redding"), who testified at trial. Redding and Primeau were married from 2003 to 2009 and lived in Japan, where Primeau was stationed while in the Air Force. Redding testified that Primeau had been physically abusive to her during their marriage. She described being beaten in the head so severely that she had scars. Redding described being kicked in the abdomen so violently that she required medical attention. She testified that initially Primeau withheld medical treatment but eventually agreed, only after she promised to lie about how she had been injured. The trial court overruled the defense's objection to her testimony.

{¶ 29} Dr. Warner Spitz ("Spitz") testified for the defense that in his expert opinion, the first set of surgeons could not have determined when the perforation to Higa's duodenum occurred. Spitz testified that surgeons could not have determined during the first surgery that the perforation occurred within the last six hours because the trauma to the abdomen and the actual perforation could have occurred at two separate times.

*State v. Primeau*, 2012 WL 5463019, *2-5 (Ohio App. 2012).

Following affirmance in the Court of Appeals, petitioner unsuccessfully sought review in the Ohio Supreme Court. The United States Supreme Court denied his petition for certiorari.

On October 7, 2014, petitioner filed his original habeas corpus petition. The petitioner filed a motion to stay to enable him to return to state court to exhaust his unexhausted claims. A Magistrate Judge filed a Report & Recommendation recommending denial of the motion and dismissal of the petition. On September 8, 2015, the late Sr. U.S. District Judge David A. Katz rejected the dismissal recommendation and granted the motion.

On November 9, 2015, the petitioner filed a state post-conviction petition. The state trial court summarily denied the petition and, later, on the petitioner's motion, filed its finding of facts and conclusions of law on the merits. O.R.C. § 2953.21(A)(2). Petitioner appealed, and the state appellate court dismissed the petition, not on the merits, but on the basis of untimeliness under O.R.C. § 2953.21(A)(2).[1] On July 20, 2017, the Ohio Supreme Court denied petitioner's *pro se* motion that it accept jurisdiction.

On January 11, 2018, petitioner filed the pending amended habeas petition.

I discuss and review the Magistrate Judge's decision, the petitioner's objections, and the respondent's response thereto in the sequence in which the petitioner has presented the objections.

## 1. Exhaustion and Procedural Default – Grounds Six and Eight

### A. Ground Six: Ineffective Assistance of Counsel

In Ground Six the petitioner claims that his trial and appellate attorneys failed to provide constitutionally adequate representation. The Magistrate Judge rejected that claim due to procedural default. The basis for that conclusion was that the state appellate court's dismissal of these claims on the basis of untimeliness *per* O.R.C. § 2953.21(A)(2).

---

[1] That provision mandates the filing of state post-conviction relief petitions within 365 day after the time in which a direct appeal may be filed.

The petitioner objects to this conclusion for two reasons: 1) it ignores the trial court's ruling, which was to *deny* the petition on the merits, whereas the appellate court, applying the time bar, had *dismissed* the petition; and 2) it was unreasonable to require a defendant, while still represented by the same lawyer on appeal as in the trial court, concurrently to challenge that attorney's effectiveness.

These are both understandable, but unavailing, contentions.

First: as the respondent correctly contends, the state appellate court's default ruling precludes federal review. That court's opinion is the last reasoned state court opinion on the claim. Moreover that court's finding of default "clearly and expressly states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989).

Second: to be sure, as petitioner emphatically asserts, application of the time bar under these circumstances is harsh. But that does not overcome the legal doctrine that the Magistrate Judge applied: namely, that ignorance of the law is no justification for not following the law. *E.g., Bonilla v. Hurley,* 370 F.3d 494, 498 (6th Cir. 2004); *see also Lynch v. Dial Fin. Co.,* 101 Ohio App.3d 742, 748 (8th Dist.1995) ("ignorance of the law does not toll the statute of limitations."); *Al–Mosawi v. Plummer*, 2012–Ohio–6034, ¶ 23 (Ohio App. 2012) (citations omitted) ("it is knowledge of the facts, not legal theories, which starts the running of the statute of limitations.").

I find no error in the Magistrate Judge's conclusion that petitioner's procedural default bars consideration of his ineffective assistance of counsel claims. I agree with the Magistrate

Judge that petitioner's lack of awareness as to the time bar and its potential effect does not excuse his default.[2]

### B. Ground Eight – Expert Testimony

Petitioner claims that error of a constitutional dimension occurred when the trial judge allowed Allison Rerko, RN, to provide her opinion testimony "about patients' psychological and behavioral patterns who are victims of domestic violence." Petitioner challenges Rerko's lack of qualifications to give such opinion evidence.[3] In support of that contention he claims that admission of her testimony was contrary to the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

The Magistrate Judge found that petitioner had procedurally defaulted this claim. This was indeed so, given the fact that at trial and on direct appeal, petitioner objected on the basis of relevance under Ohio R. Evid. 401 and 403. He now bottoms his objection on Ohio R. Evid. 702.

I agree with the Magistrate Judge that petitioner failed to preserve his constitutional challenge in the state courts. Thus he cannot present it here.

---

[2] I agree as well with the respondent that the case which petitioner cites in support of his effort to avoid the defaulting effect of the time bar, *State v. Lentz*, 639 N.E.2d 784, 785–86 (Ohio 1994), is distinguishable on its facts. In *Lentz* different public defenders represented the defendant at trial and on appeal. The Court remanded for a determination whether an actual conflict existed that prevented the appellate defender from raising on appeal an ineffectiveness challenge as to the public defender who served as trial counsel. As respondent points out, that case does not address the situation here, where no such conflict existed. Had the petitioner in fact perceived the deficiencies he now attributes to his trial attorney, he could have discharged that lawyer, secured appointment, at public expense, of successor appellate counsel, and timely challenged the adequacy of his trial attorney's representation.

[3] I agree with Magistrate Judge Greenberg rejection of petitioner's complaint about the failure to provide Ms. Rerko's medical records. That request was based on supposition and speculation.

In any event, there was nothing so egregious or unfair about Rerko's testimony that would possibly have brought it out of the doctrine that state court rulings on evidence, whether right or wrong, are generally not cognizable in a federal habeas corpus proceeding. *E.g.*, *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) ("[S]tate-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"). Nothing in Rerko's testimony meets this demanding standard.

### 2. Ground One – Sufficiency of the Evidence

In a conclusory manner, the petitioner asserts that the Magistrate Judge "misinterpreted and misstated" his habeas challenge to the sufficiency of the evidence to sustain his conviction. According to his objections, the petitioner "does not challenge the credibility of the witnesses or evidence presented by the state, but rather points to the lack of evidence connecting him with the assault on [his wife]." *Id*.

It is the petitioner, however, and not the Magistrate Judge, who mischaracterizes how his petition challenged the sufficiency of the evidence. The petition asserted that the evidence against him was "pure allegation and speculation," including "irrelevant anecdotes of neighbors and a pizza delivery man who claim to have heard sounds of people yelling and seen bruises or marks – all on other occasions unrelated to this incident." (Doc. 28, PageID #2874) (quoting Doc. 24, PageID #2086)). The petition thus squarely challenged both credibility and "the evidence presented by the state."

In addition, the Report & Recommendation encompasses the objection's claim of a lack of evidence connecting him with the deadly assault on his wife. The Magistrate Judge specifically reviewed the allegation in the petition that "there was never any evidence presented

8

that connected [him] to [his wife's] injuries aside from the misinterpretation of a gesture and what should have been inadmissable [*sic*] testimony of other acts." (*Id.*) (quoting Doc. 24, PageID #2087)).

The petitioner's challenges to the admissibility of evidence are, as noted, not cognizable. In any event, the record supports the admissibility under Ohio R. Evid. 404(B) of the testimony as to the oft perceived indicia of assaults.

The petitioner's claim of "misinterpretation" challenges the jury's interpretation of the evidence as a whole, which, on review, sustains the jury's verdict. There was, moreover, no "lack of evidence connecting him with the assault on his wife." No spoken word could have been as eloquent an accusation, as the victim's act, after a nurse asked the victim who had assaulted her, of pointing first to her wedding ring and then to a chair the petitioner had just occupied. It was for the jury to evaluate that evidence in light of the other evidence in the case, including the testimony about the victim's later references to "a black guy."

I repeat the Magistrate Judge's indisputably correct summary of the applicable legal benchmarks:

> A petitioner who claims the evidence at trial was insufficient for a conviction must demonstrate that, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319,(1979). *See also Scott v. Mitchell*, 209 F.3d 854, 885 (6th Cir. 2000). The role of the reviewing court in considering such a claim is limited:
>
> A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court. It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims. The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim. *Matthews v. Abramajtys*, 319 F.3d 780, 788-89 (6th Cir. 2003) (internal citations omitted). Moreover, it is well established that "'attacks on

witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence.'"

(Doc. 28, PageID #2877) (quoting *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002) (in turn quoting *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir.1984))).

Applying these standards, as Magistrate Judge Greenberg did, to the trial record as a whole, it is clear that he correctly evaluated the constitutional sufficiency of the evidence. There was no flaw of constitutional dimension in the admission of the challenged evidence, which, when weighed favorably, amply sustained a rational jury's verdict.

I agree entirely with Magistrate Judge Greenberg's thoughtful and thorough review of the transcript and application of the requisite legal standards to it.

### 3. Grounds Two, Three, Four, Five, and Eight – Evidentiary Issues

Petitioner lumps together his objections to the Magistrate Judge's conclusions as to his five admissibility-of-evidence grounds for relief.

The first of these (Grounds Two and Three) relate to evidence the court admitted under Ohio R. Evid. 404(B), namely the testimony of: 1) petitioner's former wife, Tiffany Redding, as to his physical abuse of her; 2) a pizza delivery man as to bruises seen on the victim; 3) neighbors, among them one living above the defendant and the victim, about arguing and loud noises;[4] and 4) Detective Harrington that he responded to a domestic violence call at the defendant's residence. In Ground Three, the petitioner claims the admission of his ex-wife Redding's testimony was especially unfair because the court had earlier ruled that it would exclude it.

---

[4] The upstairs neighbor testified to hearing such noises on several occasions. She also testified that on the day of the offense she heard what sounded to her like someone being struck, followed by crying.

10

The Magistrate Judge found no basis for relief, absent binding precedent forbidding such judicial course reversal. He also found no basis for relief in the admission of this evidence. *See Bugh v. Mitchell*, 329 F.3d 496, 512-513 (6th Cir. 2003).[5] The Magistrate Judge correctly found Grounds Two and Three to be without merit, and I overrule the petitioner's objections to the contrary.

Ground Four and Five are interrelated: The petitioner claims that his right to due process was violated when: 1) the prosecutor did not produce a statement by ex-wife Reddick until shortly before trial; and 2) the court did not sanction the prosecutor for such untimely production.

On direct appeal the state court rejected petitioner's contention that the prosecutor had violated Ohio Crim. R. 16 to a due process-violative degree. The Magistrate Judge likewise perceived no due process violation. Moreover, he concluded, as I do, that the state court's handling of these issues was not contrary to clearly established Supreme Court precedent.

The Magistrate Judge's conclusions that Grounds Four and Five lacked merit are well founded.[6]

As to Ground Eight, having already upheld the Magistrate Judge's determination in my earlier discussion of the issues that that Ground raises, it is not necessary to review this claim further here.

---

[5] I agree with the Magistrate Judge's reading – and inapplicability – of *Old Chief v. United States*, 519 U.S. 172 (1997). While that case dealt with Fed. R. Crim. P. 404(b), its ruling did not encompass constitutional issues.

[6] There being no merit to Ground Four, the lack of sanction, urged as a basis for relief in Ground Five, caused no prejudice.

11

## 4. Ground Seven – Reference to Post-Arrest Silence (*Doyle* Claim)

Under *Doyle v. Ohio*, 426 U.S. 610, 618 (1976), a prosecutor cannot call the jury's attention to a defendant's silence after officers have, post-arrest, provided the *Miranda* warnings. The petitioner claims the following exchange between the prosecutor and Detective Rutt contravened *Doyle*:

> State: And will you again now describe for the ladies and gentlemen of the jury, when you first encountered [Primeau] what if any observations did you make about his person?
>
> Rutt: He was very calm, didn't say a word to me. Asked him to stand up, placed him in handcuffs, and he absolutely showed no emotion, which is pretty much blank.
>
> \* \* \*
>
> State: In your experience, when you do place someone under arrest is it more usual or unusual for them to remain completely quiet?
>
> \* \* \*
>
> Rutt: No, they don't remain quiet.
>
> \* \* \*
>
> State: But it is your testimony that the defendant did?
>
> Rutt: Yes. I would have to say almost everybody I arrest —
>
> Defense counsel: Note that no question was posed, your Honor.
>
> Court: Sustained at this point.
>
> \* \* \*
>
> State: All right. Now, you previously indicated to us what your observations were with respect to emotions or lack thereof at the time of his arrest. How about now as you are processing or booking him?
>
> Rutt: During booking there is still absolutely no emotion, no questions were asked about the victim, his wife.

12

The state appellate court held that no Fifth Amendment violation had occurred and that Detective Rutt's testimony was admissible lay opinion under Ohio R. Evid. 701.

*Doyle* only applies where the State elicits evidence of or commentary on a defendant's post-arrest silence after he has received the *Miranda* warnings. The rule protects the defendant who heeds those warnings. *Doyle, supra,* 474 U.S. at 291. Comment on post-arrest, pre-warning silence is outside its ambit, *see Fletcher v. Weir*, 455 U.S. 603 (1982), and here Detective Rutt had not administered *Miranda* warnings at the time of the petitioner's arrest and booking. (Doc. 28, PageID 2399).

The Magistrate Judge correctly found the state appellate court's decision not contrary to or an unreasonable application of *Doyle* and, as well, that any error was harmless under the *Brecht* rule.

## Conclusion

It is hereby ORDERED THAT:

1. The petitioner's objections to the Report & Recommendation of the Magistrate Judge be, and the same hereby are, overruled;

2. The Magistrate Judge's Report and Recommendation (Doc. 28) be, and the same hereby is, adopted as the order of the court;

3. The amended petition for a writ of habeas corpus (Doc. 24) be, and the same hereby is, denied; and

4. No certificate of appealability will issue,

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge